IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-714

Filed 3 October 2023

Onslow County, No. 18CRS52479

STATE OF NORTH CAROLINA

v.

JAMES KELLY MOORE, III

Appeal by defendant from judgment entered 17 February 2022 by Judge
Henry L. Stevens in Onslow County Superior Court. Heard in the Court of Appeals
6 September 2023.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General
> Jonathan P. Babb, for the State.*
>
> *Mark L. Hayes, for the defendant-appellant.*

TYSON, Judge.

James Kelly Moore, III ("Defendant") appeals from judgment entered on a
jury's verdict finding him guilty of first-degree murder. We find no error.

## I. Background

Defendant and his girlfriend, Erica Gaines ("Gaines") moved to and resided on
East Fort King Street in Ocala, Florida in March 2017. After Thanksgiving 2017,
Defendant borrowed Gaines' Kia Sorrento SUV to purportedly visit his family in

North Carolina for the weekend. Defendant failed to return the vehicle until approximately two to three weeks later.

After arrival in North Carolina, Defendant and Amanda Bell ("Bell") visited Laura Saldana's home in the Northwoods area of Jacksonville in the early morning hours of 3 December 2017. Defendant and Bell left Saldana's house in Gaines' Kia Sorrento. Defendant drove to a field located off Thomas Humphrey Road, parked, and the two "made out" in the vehicle. Defendant later drove Bell to a hotel, arrived around 6:00 a.m., and engaged in sexual intercourse.

Defendant and Bell left the hotel after a few hours to eat and later returned to the hotel. Defendant left, while Bell stayed at the hotel. Throughout the morning of 4 December 2017 Defendant left and returned to the hotel a few times. Defendant returned to the hotel for the last time at approximately 12:30 p.m.

Defendant had access to two cell phone numbers. Both of those phone numbers exchanged hundreds of text messages with a cell phone number associated with a prostitute, Shelby Brown ("Brown"), on 3 and 4 December 2017. Brown advertised on Backpage.com, a website used for sexual solicitations, and was "pimped" by Tamara Jackson ("Jackson"). Jackson had provided Brown with a cell phone to use for her prostitution contacts.

Brown lived with Jackson in a mobile home Jackson had rented, located on 183 Orvin Drive in Sneads Ferry. A camera recording on Orvin Drive showed a Kia Sorento SUV going to 183 Orvin Drive and leaving multiple times on 3 December

2017 and 4 December 2017. The camera showed the Kia Sorrento: arrive at 4:14 p.m. and leave at 4:42 p.m. on 3 December 2017; arrive at 11:37 p.m. on 3 December 2017 and leave at 1:15 a.m. on 4 December 2017; and, arrive at 2:41 a.m. and leave at 3:11 a.m. on 4 December 2017.

Wendy Moore, Brown's mother, awoke to a text message from Brown saying "This ni--a I'm wit might kill me he jus beat me up n raped me in the back seat so I love you if I don't see u again." Moore called and spoke with Brown. While talking on the telephone Moore and her daughter also exchanged text messages. Moore asked Brown over the telephone where she was located or where she was going. Brown replied via text message "Belgrade." Moore replied *via* text message: "U want me to call popo" and "Call 911 or I will."

Brown responded by text message asking "Are u high?" Moore replied "Stop playing f--king games." Moore called Brown. Brown sounded upset to her, was crying, and asked Moore why she had done that. Moore did not speak with Brown again after 4 December 2017.

Moore contacted Mariann Milan ("Milan"), Brown's best friend, and asked her to contact Brown and learn what was happening to her. Milan contacted Brown *via* Facebook Messenger, but she was suspicious of Brown's purported replies, because the messages incorrectly used the homophones: "too" and "to." Brown regularly used the words correctly when she had written prior messages. Milan never heard from Brown again after 4 December 2017.

- 3 -

Jackson, the pimp, exchanged text messages with Brown's cell telephone number at 1:30 p.m. on 4 December 2017. Jackson texted Brown stating she needed her cell phone back. Brown replied she would return the cellphone and further stated: "Mama. Chill. I'm coming ok. And I might have some thing good for u. I just seen a bag full of mone[money bag emoji.] 25 thousand[.] Looking at it right now[.]" Brown texted she needed to be picked up in the Northwoods area. A text message sent at 6:39 p.m. gave an address of 308 Doris Avenue and the description "Black. Older guy."

Jackson went to the address given on the corner of Vernon Drive and Doris Avenue around 9:00 p.m. that evening, but Brown was not there. The text message exchange purportedly from Brown also incorrectly used the homophones: "too" and "to." Later analysis of the phone records showed the numbers for both Brown and Defendant were located in Sneads Ferry, about 20 minutes from the Northwoods area.

Defendant's cell phone number (336)-830-XXXX was carried on Gaines' Verizon account. Defendant called Gaines and asked her to change his cell phone number while he was in North Carolina. A few hours later, Defendant called Gaines screaming and yelling because she had not yet changed his phone number. Gaines changed Defendant's phone number to (336)-978-XXXX.

Denell Sharek ("Sharek") also worked as a prostitute and advertised on Backpage.com. Sharek requires new prospective "tricks" to send a picture of themselves to her. Defendant, who Sharek later identified as "June" sent her a

picture of himself from phone number (352)-600-XXXX on 3 December 2017 at 4:12 a.m.

Defendant texted Sharek and requested to see her for an hour on 5 December 2017. Defendant's visit was quoted to cost $200. In the text messages between Defendant and Sharek, Defendant incorrectly used the homophones: "too" and "to." Sharek took a cab to Defendant's location for their encounter. Defendant had Sharek get into his dark colored SUV. Sharek panicked because she did not do "car dates." They drove off of the paved road, through gravel, and into a field. Sharek later identified this location as at the end of Thomas Humphrey Road off the paved portion.

Defendant parked the SUV, exited the SUV, and got into the backseat. Defendant pulled Sharek out of the front passenger's seat and into the backseat. Sharek testified Defendant raped her. When Defendant completed his crimes, he told her to get out of the SUV and walk. Defendant kept Sharek's cell phone and purse, which contained around $600 to $700 in currency. As Sharek walked towards the hotel where she was staying, Defendant drove up in the SUV beside her and told her to get inside. Defendant returned her purse and cellphone, but the money from inside the purse was gone. Sharek did not report this incident to law enforcement until they began investigating Brown's homicide.

At 7:39 a.m. Sharek received a missed call and four text messages from (910)-548-XXXX, a cell number Brown had used. No prior communications had occurred between Brown and Sharek. The text messages stated: "Hey there beautiful sexy

lady;" "Are you doing out calls;" "Hello;" and, "Hey babe." Sharek did not respond to the missed call or the text messages. Sharek also received text messages from (910)-335-XXXX and (336)-978-XXXX, both numbers associated with Defendant.

Defendant returned Gaines' Kia Sorento SUV to her in Florida before Christmas. Gaines testified her Kia Sorrento contained a "really bad odor" inside, unlike any odor Gaines had smelled before. When Gaines asked Defendant about the smell, he responded a friend had left a bag of chicken in the back. The floorboard and third-row seats were wet. Gaines used carpet freshener to try to alleviate the odor. The stench was so strong Gaines would leave the windows down.

Gaines noticed Defendant had an open wound on his chest. When Gaines questioned him, Defendant said he had been bitten. Defendant had scratches on his arms, which Defendant asserted had resulted from mosquito bites. Gaines' Kia Sorrento SUV was repossessed by the lender on 7 January 2018. Gaines' child had left a Batman mask inside the vehicle.

Children from Onslow County found a partially burned and decomposed body in a grassy area near a dirt road off Thomas Humphrey Road on 31 December 2017. The grass around the corpse did not appear to be burned. Law enforcement officers had walked in that area investigating gunfire previously and had not seen a body. An individual who had walked his dog there a week prior to discovery did not see anything at that time.

The corpse was decomposing with extensive maggot infestation. The body had multiple areas of burning with significant burning around her pelvic area. The State Medical Examiner identified the body as Brown's through fingerprints.

Dr. Zachary O'Neill performed the autopsy on 8 January 2018. Dr. O'Neill observed ten stab wounds to the left and right of Brown's neck. Nine of the wounds were located close together, and at least one of the stabs caused a lethal injury of the right jugular vein. Dr. O'Neill testified the stabbing had occurred first and was the cause of Brown's death. The burning occurred after Brown was deceased, and then the decomposition occurred.

The *Jacksonville Daily News* published an article on 11 January 2018 stating a body was found off of Thomas Humphrey Road on 31 December 2017. Google search records associated with the account Junehova@gmail.com showed a search was performed on 11 January 2018 asking: "can autopsies show sperm in a decomposed body[?]" The GPS cellular records for the inquiry originated from an address on East Fort King Street in Ocala, Florida, where Defendant and Gaines lived.

Gaines' former Kia Sorrento was sold by the lender to an overseas buyer located in Costa Rica. Law enforcement officers located the Kia vehicle in a Florida port the day before it was scheduled to be shipped abroad. Law enforcement officers found white powder, which appeared to be carpet deodorizer, and the vehicle's interior was damp. Positive indications for the presence of blood were located on: the front carpet on the drivers' side, an access panel in the back of the vehicle, and the

vehicle's third row. A Batman mask was inside the vehicle. Several swabs taken from the vehicle were submitted for DNA testing.

The vehicle's access panel swab had a DNA profile, which was a mixture of two contributors: the major profile being consistent with Brown's DNA profile and a minor profile that was inconclusive. The third-row seat sample had a DNA profile which was consistent with Brown's DNA profile. The sample from the driver's side front carpet was insufficient for DNA analysis.

Defendant was indicted for first-degree murder on 12 June 2018. Krystal Moore, Defendant's sister, a licensed attorney in Georgia, was permitted *pro hac vice* to appear in Onslow County Superior Court. Moore had listed George Battle of Mecklenburg County as her North Carolina sponsoring counsel. *See* N.C. Gen. Stat. § 84-4.1(5) (2021) ("A statement to the effect that the attorney has associated and is personally appearing in the proceeding, with an attorney who is a resident of this State, has agreed to be responsible for filing a registration statement with the North Carolina State Bar, and is duly and legally admitted to practice in the General Court of Justice of North Carolina, upon whom service may be had in all matters connected with the legal proceedings, or any disciplinary matter, with the same effect as if personally made on the foreign attorney within this State.") The record contains no evidence of Battle appearing in Onslow County Superior Court at any time during Moore's representation of Defendant.

Defendant retained Thomasine Moore, who was not related to Krystal Moore or Defendant, as co-counsel. Thomasine Moore filed a motion to withdraw due to a conflict of interest on 23 August 2018, which the court allowed on 19 December 2018. Krystal Moore submitted a motion dated 23 July 2018 and filed 13 December 2018 requesting for the trial court to appoint additional counsel. The trial court appointed Walter Hoyt Paramore, III on 19 December 2018.

Paramore filed a motion to withdraw as counsel, which was allowed. Paul Castle ("Castle") was next appointed as Defendant's attorney on 30 January 2019. A trial date was set for 30 September 2019. Castle filed a motion to withdraw due to his inability to work with Krystal Moore. The trial court held a hearing on 23 August 2019 to hear Castle's motion. At the hearing, Castle asserted: "an irreparable conflict arose between him and [Krystal] Moore." Castle further asserted he was asked to withdraw by Krystal Moore. Castle acknowledged one counsel cannot force another to withdraw from representation, but the situation was conflicted because Defendant and Krystal Moore are siblings. Castle was also unable to contact Defendant.

The 23 August 2019 hearing began at 2:03 p.m. Krystal Moore was not present when the hearing commenced. The trial court heard from Castle, the State, and Defendant. The trial court then addressed Defendant:

> THE COURT: Okay. [Defendant], do you understand the motion that we're here for today?
>
> . . .

DEFENDANT: Yes, sir.

THE COURT: And do you understand that Mr. Castle is asking to withdraw?

DEFENDANT: Yes, sir.

THE COURT: And you understand that's because he can't effectively assist you, apparently because of your sister's representation. Do you understand that?

DEFENDANT: Yes, sir.

THE COURT: Okay. Do you want to be heard as to his motion to withdraw?

DEFENDANT: He can withdraw, yes, sir.

THE COURT: Okay. And you told me last time that you were going to hire an attorney, is that correct?

DEFENDANT: I am.

THE COURT: Have you hired anybody?

DEFENDANT: I would have to get in contact with my sister and talk to her about it, and my family members.

THE COURT: Okay. And I understand that your sister is representing you, and this matter has been set at least twice in front of me with an order that she be here, and she hasn't appeared yet. Do you understand that?

DEFENDANT: Yes, sir.

. . .

THE COURT: Okay. Anything you want to say, [Defendant], before I make the decision?

DEFENDANT: I mean, he can withdraw.

The trial court then addressed the State. The State spoke on Krystal Moore's non-attendance in court, the requirements for admission *pro hac vice*, and Defendant's current representation:

> [DISTRICT ATTORNEY]: Judge, you know, of course, Krystal Moore is not here. We've not seen Krystal Moore in this courtroom since January the 23rd of 2019. She was ordered to be here today. She was ordered to be here today. And, Judge, as the Court is also well aware, sir, that she's in this case pro hac vice with another attorney and, Judge, I know the Court is aware of the statute. We've reviewed the same. Let's see. It's G.S. 84-4.1, and one of the requirements, it does appear, to be some personal appearance from that attorney. That attorney she's listed is an individual in Mecklenburg County by the name of George Battle. He has also never appeared in this court. We've never had any contact with him. I think [my co-counsel] attempted to reach him early in the proceedings, and he never spoke to him. Is that correct?
>
> [ASSISTANT DISTRICT ATTORNEY]: That's right.
>
> [DISTRICT ATTORNEY]: So, Judge, we've got a lot of issues here, in terms of representation. But if the record would reflect that Ms. Moore is not present today.

The trial court then revoked Krystal Moore's *pro hac vice* admission *ex mero motu*:

> THE COURT: Okay. Sir, on my review of the statute that [the State] is referencing, which is North Carolina General Statute 84-4.1, it indicates in that that when she was let in - - I understand from previous discussion that Ms. Thomasine Moore was representing you, who is a local counsel here who is experienced. And to be admitted to - -

- 11 -

it says you're going to associate with local counsel who is going to be appearing in the proceedings with you. And that local counsel is no longer included.

So, in my discretion, under 84.4 - - 84-4.2, on my own motion, I'm going to revoke your sister's pro hac vice status here. That's going to leave you without a counsel, because I'm going to allow Mr. Castle to withdraw. What I'm going to do is, I'm going to appoint IDS immediately to represent you so that you've got somebody there to appear for you that can answer your questions. Do you understand what I'm saying so far?

DEFENDANT: So are we trying to say she's not going to be my lawyer no more?

THE COURT: Yes. She's not - - doesn't have the authority to practice law in the State of North Carolina. So I'm going to appoint a capital defender to represent you. They will participate, if they can - - if they're the lead counsel.

Krystal Moore arrived at 2:11 p.m. after the above colloquy. The following exchange took place:

THE COURT: Is this Ms. Moore? Ms. Moore, we started at 2:00.

MOORE: I understand, Your Honor. I'm traveling from out of town.

THE COURT: Okay. Did you communicate with anybody that you were going to be late?

MOORE: Yes, I communicated - - it was earlier this week - - that I was going to be late. Ms. Caitlin Emmons.

THE COURT: Okay. You're talking about the judicial assistant - -

MOORE: Yes.

. . .

THE COURT: I understand from my judicial assistant that she notified you that the hearing was going to be today and there was no response after you asked to appear by telephone.

MOORE: When she said that it was going to go forward and I had already told her that I had a conflict in my schedule, I'm here as soon as possible.

THE COURT: Okay. I understand that Mr. Castle has asked to withdraw. You can put your stuff down. At this point, I have allowed Mr. Castle to withdraw, which gets us back to the issue of do you have counsel in the State of North Carolina that is appearing with you?

MOORE: We would have to move to appoint new counsel.

THE COURT: Say again.

MOORE: We would have to move to appoint new counsel. I do have someone, as far as my sponsor, for my pro hac, yes. And so --

THE COURT: Okay. Well, there's nobody that's appearing in this case. Nobody has appeared in this case, with the exception of Thomasine Moore, who was removed or withdrew. I don't know when the date was, but I can look through the file and figure it out, but it's been at least one attorney back.

THE STATE: It was December 13th of '18, sir.

THE COURT: Of 2018?

THE STATE: Mm-hmm.

THE COURT: So what's the plan? I understand that He's [sic] on trial in a first-degree murder case in September, next month.

MOORE: That is correct, Your Honor.

THE COURT: And this is the first time you've been here since January?

MOORE: I'm not sure when the last time I've been here.

THE COURT: Okay. Is there anything you want to say?

MOORE: We would like to move to appoint new counsel, and would like an order entered doing so.

THE COURT: I understand from Mr. Castle that he's had problems communicating with your brother because of your involvement; that he didn't get discovery from you and had to go to the D.A.'s office to get it. Is that the case?

MOORE: Absolutely not, Your Honor.

THE COURT: If I have IDS coming in, they're the ones that have the experience in representing people in capital cases in the State of North Carolina. I would appoint them as lead counsel, unless you're planning on hiring somebody that you're going to associate that is going to be appearing in this courtroom with you at every proceeding that we have.

. . .

THE COURT: Okay. I'm going to do that, under one condition, but let me ask you this. How much criminal experience do you have doing criminal cases? Because he's on trial for first-degree murder.

MOORE: I'm aware of that, Your Honor.

THE COURT: So how much time, criminal?

MOORE: Are you asking how many cases?

THE COURT: Yes.

MOORE: I already went over my qualifications with the other judge.

THE COURT: Right. And I have the authority to remove you right this second from it. So I'm asking a question, and I would appreciate an answer.

MOORE: It's part of my practice.

THE COURT: Okay. I'm going to assume that to be none, since you can't answer it.

MOORE: No. I mean, you asked me a question. I said it's part of my practice. I do it often.

THE COURT: Okay. Anything else from the state?

. . .

THE COURT: And so you're asking me to appoint somebody else. He had a great lawyer in there with Mr. Castle, and now he's out. And I understand, again, this matter, at least, was set for September 30th, if I'm not mistaken.

[THE STATE]: September 30th, that's right, Judge.

THE COURT: Okay. Is there anything else you want to say, ma'am?

MOORE: I would like to say that Mr. Castle also has a conflict that he did not disclose to the client or to myself, and that is one of the reasons that I asked him to withdraw.

THE COURT: Okay. Do you want to be heard?

MR. CASTLE: I'm not aware of any such conflict.

THE COURT: Okay. All right. In this case – this is a very serious case, ma'am, and these guys do this for a living and have for decades, doing these type of cases. I have, in the interest as a judge on the North Carolina Superior Court, to ensure that he has a fair trial, that he's represented competently. And so, again, I've allowed Mr. Castle to withdraw. I don't have anyone here that is appearing with you in this case that you have associated. You're asking

me to associate them by making them the -- by me appointing somebody.

MOORE: No, Your Honor.  I actually do have association in the case for my pro hac.  That's not an issue.

THE COURT: That's a guy in Charlotte, from what I understand in the hearing when you weren't here.  And I don't know what he does, either, but he's not appearing in this case and hasn't appeared.

MOORE: That's all that we needed, as far as my pro hac. Your Honor, we're actually asking for an appointment of counsel to assist with the case.

THE COURT: Okay.  Well, I'm going to do it the other way around.  I'm going to – I'm going to, under my own motion, ma'am, and in my discretion, I'm going to revoke your pro hac vice status.  I am going to appoint IDS, Indigent Defense Services, to represent him.  If y'all hire somebody here, then they can take it over, that's fine, but we'll get a name of the counsel and we'll provide it to [Defendant], okay?

MOORE: And, Your Honor, why are you revoking my --

THE COURT: It's totally in my discretion.  I don't feel like it's moving forward.  I think we're going to have an ineffective assistance of counsel.  You haven't appeared here in a murder case since January.  I mean, I could keep going.  I don't feel like you have -- I don't feel like that it's going to be in [Defendant]'s best interests to be represented by his sister.

MOORE: Your Honor, you're saying that I haven't appeared here since January.  We actually set the matter for trial, and there was only one other admin date that the D.A.'s office said that they actually needed.  And so that's one of the reasons why I haven't appeared here, because there is no more admin dates.

THE COURT: Okay.  We had one two weeks ago, on Friday.

Weren't we here on Friday, two weeks ago?

[THE STATE]: Yes, sir.

MOORE: That -- from my understanding, that was not an admin hearing, with regards to --

THE COURT: That was a hearing in which [Defendant] was in here and I was addressing Mr. Castle's motion to withdraw. So at this point, with the matter as serious as it is and with it drawing near for time to have the trial, that's the Court's order, and I will appoint IDS. If we can contact them and let them know. Okay. Anything else?

Attorney Scott Jack ("Jack") was appointed to represent Defendant on 23 August 2019. The parties agreed on 12 August 2020 to a proposed trial date of 1 February 2021 subject to the jury not being required to wear face masks due to COVID-19. Jack was allowed to withdraw as Defendant's attorney at Defendant's request on 8 September 2020. Defendant told the trial court he and Jack had developed "different views on certain issues." At the hearing Defendant stated he was going to retain his own counsel or otherwise to represent himself. The trial court engaged in a colloquy regarding counsel and waiver with Defendant, who signed a waiver of counsel.

On 3 December 2020, with trial still scheduled to begin on 1 February 2021, Defendant told the trial court he was still in the process of finding an attorney because "those attorneys that was for Onslow County was not for me" but "if it doesn't come in, [he's] still good enough to handle [his] own situation." Attorney Bellanora McCallum ("McCallum") was appointed as standby counsel.

Defendant informed the trial court he wanted McCallum to represent him on 7 January 2021. McCallum was appointed as trial counsel that day. Defendant's trial date was continued and re-scheduled for 28 June 2021. Defendant's 28 June 2021 trial was later continued until November 2021, and was then continued again until 7 February 2022. No speedy trial motion was filed or objection was raised by Defendant prior to trial.

Jury selection ended on 8 February 2022. The next day the parties made opening statements. On 10 February 2022 McCallum informed the trial court she had received an email from Defendant's sister, Krystal Moore, on the previous day with an attachment which contained a complaint to the North Carolina State Bar containing Defendant's typewritten signature. The trial court questioned Defendant about his satisfaction with McCallum's representation and services. Defendant responded and informed the trial court he had "no problem" with McCallum's services.

Krystal Moore also emailed the district attorney and assistant district attorney assigned to the case on 9 February 2022. Attached to her email was a drafted complaint about both attorneys to the North Carolina State Bar. The complaint was signed by Krystal Moore.

The State proceeded with its case-in-chief. McCallum informed the trial court Defendant requested for her to withdraw from representation on 14 February 2022. McCallum informed the trial court she had also received an email from Krystal Moore

demanding McCallum not to harass her anymore. McCallum did not respond to the email and continued to prepare and communicate with Defendant and his parents. In chambers, McCallum reported to the court that Defendant had advised her to withdraw from representing him for her safety.

McCallum further reported she was unable to provide effective legal assistance after conversations with Defendant concerning his request for her to withdraw from representation. McCallum also asserted she could not effectively represent Defendant under constant threat of having frivolous bar complaints filed against her.

When the trial court addressed and questioned Defendant on his request for McCallum to withdraw, he stated "I was going to handle this first, but from my understanding I can get some more attorneys in here." McCallum requested a continuance to allow Defendant to find new counsel. The trial court informed Defendant that he had time to prepare for this trial for years and months and a new attorney would not be able to "come in and start handling a case" in the middle of a trial already underway.

Defendant stated he wanted the trial court to "stop the trial because there is too much going on." The trial court told Defendant the trial had already begun and would continue. The trial court further warned Defendant he would be forfeiting his right to appointed counsel if he persisted in having McCallum removed.

The trial court engaged in the following colloquy with Defendant and his counsel out of the presence of the jury:

THE COURT: Okay? That is not being ugly. We have gone through all of this time and this is a 2017 case. So it's time to get it done. She is a very good attorney. She can stay in the case or I'm going to find out what you want to do about attorney.

DEFENDANT: No. I want to excuse [McCallum].

THE COURT: Let me go through these questions with you because that probably means you're going to be representing yourself. Do you understand that? You've, basically, forfeited your right to have an attorney if you fire her because you have gotten rid of every other one since then. Do you understand that?

DEFENDANT: Yes, sir, I do.

THE COURT: Let me go through these questions with you real quick.

MCCALLUM: Can you give them some time to see if there's an attorney that they found who can show up this week? I will just say that. Can you give him an opportunity to call up the attorney they found to see if they can show up this week?

THE COURT: My only issue with that is before you got in the case. When I was talking to [Defendant], they were going to have Black Lives Matter bring an attorney in and that attorney has yet to show up. At this point, we have jurors that are missing their work to be here. That poor lady at the end said that she can't afford two-weeks, and this is just dragging it out further. Let me go over these questions with you real quick, [Defendant]. I know that you can hear me and understand me. Are you now under the influence of any alcohol, drugs, narcotics, medicines, pills, or any other substance?

DEFENDANT: No, sir, I'm not.

THE COURT: Any other pills?

DEFENDANT: No, sir.

THE COURT: For the record how old are you, sir?

DEFENDANT: Fourty-four,[sic] forty-five. One of them.

THE COURT: Fourty-five? [sic] How far did you go in school?

DEFENDANT: Graduated high school.

THE COURT: You understand how to read and write; is that correct?

DEFENDANT: Yes, sir.

THE COURT: Do you have any mental handicaps?

DEFENDANT: No, sir, I don't.

THE COURT: You understand you do have the right to be represented by an attorney, and the Court has appointed a multitude of them, and now this one is still sitting beside you and I'm about to let her out. You understand you do have the right to be represented?

DEFENDANT: Yes, sir, I do.

THE COURT: Do you understand that if you decide to represent yourself by getting rid of her that you have to follow the rules of evidence and procedures that lawyers do?

DEFENDANT: Yes, sir, but I am not representing myself.

THE COURT: If you let her go I'm telling you that you're going to be forfeiting your right to have an attorney.

DEFENDANT: That's fine.

THE COURT: You understand if you do represent yourself that you are held to the same legal standards. I can't give you legal advice?

DEFENDANT: Yes, sir, I understand.

THE COURT: Do you understand that you are charged with murder, and the maximum sentence is life without parole, and you're willing to handle that without an attorney?

DEFENDANT: Yes, sir, I understand. I will have an attorney come in.

THE COURT: Okay. Anything else from the State?

[THE STATE]: I just want to make sure that it is clear that he does not want this attorney that is sitting next to him right now, Ms. Bellonora McCallum. That is his intent.

THE COURT: I think he's been clear. Is that your intent for her to withdraw?

DEFENDANT: Yes, sir.

THE COURT: You're positive?

DEFENDANT: Yes, sir.

THE COURT: Okay. I'm going to allow her to withdraw.

The trial court permitted McCallum to withdraw from representing Defendant and concluded Defendant had forfeited his right to further appointed counsel by his conduct. Defendant's trial proceeded. Defendant was advised of his right to be present and participate to represent himself. Defendant elected to leave the courtroom to make "phone calls." Defendant represented he did not wish to be present in court, cross-examine witnesses, present evidence, or to provide a closing argument.

Defendant made three oral motions at the beginning of court on 17 February

2022 asking for new counsel to be appointed, a mental health evaluation to be performed on him, and for a mistrial. The trial court denied all three motions. The same day, Defendant was convicted of first-degree murder. The trial court found Defendant to be a prior record level V offender with 16 prior level points. Defendant was sentenced to life imprisonment without the possibility of parole. Defendant gave oral notice of appeal in open court.

Defendant filed a *pro se* motion for appropriate relief ("MAR") in the trial court on 28 February 2022. The trial court denied the MAR by order filed 11 April 2022. Defendant filed a written notice of appeal of the order denying his MAR on 14 April 2022. On 17 May 2022 Defendant filed a motion to consolidate the appeals of the original judgment and the denial of the MAR, which was granted by order on 20 May 2022.

## II.    Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b), 15A-1414, and 15A-1444(a) (2021).

## III.    Issues

Defendant argues the trial court erred by: (1) denying his right to counsel when he sought to change attorneys during trial; (2) denying his motion for a continuance when he sought to change attorneys during trial; and, (3) allowing Sharek to testify about unrelated allegations.

## IV.    Defendant's Right to Counsel

Our Court previously articulated two means by which a defendant may lose

his right to be represented by counsel: (1) a knowing and voluntary waiver after being

fully advised under N.C. Gen. Stat. § 15A-1242; and, (2) forfeiture of the right by

serious misconduct in *State v. Blakeney*, 245 N.C. App. 452, 459-61, 782 S.E.2d 88,

93-94 (2016), holding:

> First, a defendant may voluntarily waive the right to be
> represented by counsel and instead proceed *pro se*. Waiver
> of the right to counsel and election to proceed *pro se* must
> be expressed clearly and unequivocally. Once a defendant
> clearly and unequivocally states that he wants to proceed
> *pro se*, the trial court must determine whether the
> defendant knowingly, intelligently, and voluntarily waives
> the right to in-court representation by counsel. A trial
> court's inquiry will satisfy this constitutional requirement
> if conducted pursuant to N.C.G.S. § 15A-1242.
>
>  . . . .
>
> The second circumstance under which a criminal
> defendant may no longer have the right to be represented
> by counsel occurs when a defendant engages in such
> serious misconduct that he forfeits his constitutional right
> to counsel. Although the right to counsel is guaranteed by
> the Sixth and Fourteenth Amendments of the United
> States Constitution and Article I of the North Carolina
> Constitution, in some situations a defendant may lose this
> right:
>
>> Although the loss of counsel due to defendant's own
>> actions is often referred to as a waiver of the right to
>> counsel, a better term to describe this situation is
>> forfeiture. Unlike waiver, which requires a knowing
>> and intentional relinquishment of a known right,
>> forfeiture results in the loss of a right regardless of the
>> defendant's knowledge thereof and irrespective of
>> whether the defendant intended to relinquish the

right. A defendant who is abusive toward his attorney
may forfeit his right to counsel.

*Id*. (internal citations, ellipses, alterations, and quotation marks omitted).

This Court in *Blakeney* also describes a third manner, a mixture of waiver and

forfeiture, in which a defendant may lose the right to counsel:

> Finally, there is a hybrid situation (waiver by conduct) that
> combines elements of waiver and forfeiture. Once a
> defendant has been warned that he will lose his attorney if
> he engages in dilatory tactics, any misconduct thereafter
> may be treated as an implied request to proceed *pro se* and,
> thus, as a waiver of the right to counsel. Recognizing the
> difference between forfeiture and waiver by conduct is
> important. First, because of the drastic nature of the
> sanction, forfeiture would appear to require extremely
> dilatory conduct. On the other hand, a waiver by conduct
> could be based on conduct less severe than that sufficient
> to warrant a forfeiture. This makes sense since a waiver
> by conduct <u>requires that a defendant be warned about the
> consequences of his conduct, including the risks of
> proceeding *pro se*</u>. A defendant who engages in dilatory
> conduct having been warned that such conduct will be
> treated as a request to proceed *pro se* cannot complain that
> a court is forfeiting his right to counsel.

*Id*. at 464-65, 782 S.E.2d at 96 (citation, ellipses, and quotation marks omitted).

## A. Standard of Review

This Court reviews a trial court's findings of fact to determine whether they

are "supported by competent evidence, in which event they are conclusively binding

on appeal, and whether those factual findings in turn support the judge's ultimate

conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)

(citations omitted). This Court "reviews conclusions of law pertaining to a

constitutional matter de novo." *State v. Bowditch*, 364 N.C. 335, 340, 700 S.E.2d 1, 5

(2010) (citation omitted); *see State v. Watlington*, 216 N.C. App. 388, 393-94, 716

S.E.2d 671, 675 (2011) ("Prior cases addressing waiver of counsel under N.C. Gen.

Stat. § 15A-1242 have not clearly stated a standard of review, but they do, as a

practical matter, review the issue *de novo*. We . . . review this ruling *de novo*.")

(citations omitted)).

Whether a defendant was entitled to or forfeited counsel is also reviewed *de*

*novo*. *State v. Poole*, 305 N.C. 308, 318, 289 S.E.2d 335, 341-42 (1982) (citations

omitted); *Blakeney*, 245 N.C. App. at 459, 782 S.E.2d at 93.

### B. Challenged Findings of Fact

Defendant challenges the following findings of fact:

> 28. The trial of the State v. James Moore case began on
> Monday, 7 February 2022. Jury selection continued until
> the end of the day on Tuesday, 8 February 2022.
> Wednesday morning, 9 February 2022, the parties made
> opening statements. On Thursday, 10 February 2022 Ms.
> McCallum told the Court that on Wednesday before
> opening statements she received an e-mail from Ms.
> Krystal Moore and attached to the email was a bar
> complaint. At first, Ms. McCallum thought it was
> something from Ms. Moore, but after going through it in
> court, she noticed that it appeared to have been signed by
> her client. The bar complaint was typed. Ms. McCallum
> thought the matter should be addressed by the Court, so
> she notified the Court of the issue. The Court questioned
> the defendant in open court outside the presence of the jury
> and concluded that the defendant was satisfied with his
> counsel.
>
> . . .

30. On Monday, 14 February 2022, Ms. McCallum represented to the Court that the defendant told her that the defendant wanted Ms. McCallum to withdraw from this matter. Ms. McCallum made this representation in chambers to the Court and then on the record. In chambers, Ms. McCallum added that the defendant told Ms. McCallum that for her safety, she should withdraw from the case. Ms. McCallum advised that she has spoken to the defendant regularly and that she believed she is unable to provide effective legal assistance after her conversation with the defendant concerning his request that she withdraw from representation of the defendant. Further, Ms. McCallum received an e-mail at midnight, 11 February 2022, from Ms. Krystal Moore directing Ms. McCallum to stop threatening Ms. Moore and stop sending messages. Ms. McCallum stated that she has not communicated or responded back or emailed Ms. Moore. The Court finds Ms. McCallum to be credible. The defendant's parents, Mr. James Moore, II and Ms. Rose Moore were present during the trial. Ms. McCallum stated that she has communicated with them and believed that the defendant's parents wanted her to continue to represent the defendant.

31. During the afternoon of Friday, 11 February 2022 Denell Sharek testified in the trial of the above captioned case. Ms. Sharek testified that the defendant sexually assaulted Ms. Sharek on 5 December 2017 in the same secluded location where Shelby Brown's Body [sic] was found. Ms. Sharek was able to identify the defendant based on a picture the defendant sent of himself to Ms. Sharek. Ms. Sharek's testimony was very unfavorable for the defendant and highly inculpatory. The Court finds that the defendant asked Ms. McCallum to withdraw as counsel in an effort to secure a mistrial because of Ms. Sharek's testimony.

. . .

35. The defendant acknowledged that he understood that he had the right to be represented by an attorney, and that

he was forfeiting his right to have an attorney by asking Ms. McCallum to withdraw. Further the defendant acknowledged that he understood that if the defendant proceeded to represent himself by terminating Ms. McCallum's representation of the defendant, he would have to follow the rules of evidence and procedures that lawyers do and that he would be held to the same legal standards as attorneys. The Court instructed the defendant that he could not provide legal advice during the trial to the defendant. The defendant acknowledged that he understood that he was charged with murder and the maximum sentence for that crime is life without parole. The defendant on multiple occasions made [it] clear his desire for Ms. McCallum to withdraw as counsel. The defendant clearly indicated that he was not satisfied with any attorneys who have been appointed to represent the defendant including Walter H. Paramore, III, Paul Castle, Scott Jack and Bellanora McCallum. All of these attorneys are well qualified and the only conflicts these attorneys had, with the exception of Mr. Paramore's conflict, were engineered by the defendant either individually or acting together with his sister, Krystal Moore.

The challenged findings of fact are supported by competent evidence in the record. *State v. Thomsen*, 242 N.C. App. 475, 485 776 S.E.2d 41, 48 (2015) (citation omitted), *aff'd*, 369 N.C. 22, 789 S.E.2d 639 (2016). Defendant's challenges are without merit.

## C. Waiver of Counsel

Defendant argues the trial court erred in concluding he had waived and/or forfeited his right to counsel.

Both the Constitution of the United States and the North Carolina Constitution recognize criminal defendants have a right to assistance of counsel. U.S.

Const. Amend. VI.; N.C. Const. Art I, §§ 19, 23; *see also Powell v. Alabama*, 287 U.S. 45, 66, 77 L.Ed. 158, 169 (1932); *State v. McFadden*, 292 N.C. 609, 611, 234 S.E.2d 742, 744 ((1977) (citations omitted); *State v. Montgomery*, 138 N.C. App. 521, 524, 530 S.E.2d 66, 68 (2000).

Criminal defendants also have the absolute right to waive counsel, represent themselves, and handle their case without the assistance of counsel. *State v. Mems*, 281 N.C. 658, 670-71, 190 S.E.2d 164, 172 (1972).

Before a defendant is allowed to waive the right to counsel, a trial court must conduct a statutorily-required colloquy to determine that "constitutional and statutory safeguards are satisfied." *State v. Moore*, 362 N.C. 319, 322, 661 S.E.2d 722, 724 (2008) (citation omitted). Courts "must determine whether the defendant knowingly, intelligently and voluntarily waives the right to in-court representation by counsel." *Id.* (citation omitted).

The procedure to waive counsel is codified in N.C. Gen. Stat. § 15A-1242 (2021). Courts may only enter an order to allow defendants to waive their right to counsel after being satisfied the movant: (1) has been clearly advised of his rights to the assistance of counsel, including his right to the assignment of appointed counsel when he is so entitled; (2) understands and appreciates the consequences of the decision; and, (3) comprehends the nature of the charges and proceedings and the range of permissible punishments. *Id.* (citation omitted). A "trial court must obtain a written waiver of the right to counsel." *State v. Thomas*, 331 N.C. 671, 675, 417 S.E.2d 473,

476 (1992) (citation omitted).

The record indicates Defendant executed a written waiver of court-appointed attorney on 8 September 2020 after the trial court had conducted a colloquy into Defendant's present mental state, not being under the influence of any drugs or intoxicants, understanding of the charge and its possible punishment, level of education attained, right to appointed or retained counsel, right to represent himself, and Defendant's obligations and responsibilities if he decided to represent himself. The transcript also reflects the trial court conducted a similar colloquy when Defendant sought to remove McCallum as his counsel during trial.

Written waivers of counsel, certified by the trial court, create a rebuttable presumption that the waiver was executed knowingly, intelligently, and voluntarily pursuant to N.C. Gen. Stat. § 15A-1242. *State v. Kinlock*, 152 N.C. App. 84, 89, 566 S.E.2d 738, 741 (2002) (citation omitted), *aff'd per curiam*, 357 N.C. 48, 577 S.E.2d 620 (2003).

"Once a written waiver of counsel is executed and certified by the trial court, subsequent waivers or inquiries are not necessary before further proceedings." *State v. Harper*, 285 N.C. App. 507, 517, 877 S.E.2d 771, 780 (2022) (citation omitted).

The signed waiver and certification by the superior court judge that a proper inquiry and disclosure was made in compliance with N.C. Gen. Stat. § 15A-1242 was not included in the record on appeal. The only mention of the signed waiver was in the transcript of the hearing where it was signed and in the order denying

Defendant's MAR. ("The defendant signed a waiver of court-appointed counsel and was sworn on the same.").

This absence in the record does not invalidate Defendant's waiver. *See State v. Heatwole*, 344 N.C. 1, 18, 473 S.E.2d 310, 318 (1996) (holding *inter alia* the lack of a written waiver neither alters the conclusion that the waiver was knowing and voluntary, nor invalidates the defendant's waiver of counsel); *State v. Fulp*, 355 N.C. 171, 176, 558 S.E.2d 156, 159 (2002) (affirming *Heatwole* holding "that a waiver was not invalid simply because there was no written record of the waiver" (citation and internal quotation marks omitted)).

Defendant further asserts he did not intend to represent himself, asserting his answer below during the 14 February 2022 colloquy stated his intention:

> THE COURT: Do you understand that if you decide to represent yourself by getting rid of her that you have to follow the rules of evidence and procedures that lawyers do?
>
> DEFENDANT: Yes, sir, but I am not representing myself.

Defendant's argument is misplaced. The transcript quoted above shows the trial court had unequivocally warned Defendant before the now-asserted reply of the practical effect and consequence of his decision dismissing McCallum would be to represent himself. However, the trial court continued the inquiry with Defendant:

> THE COURT: If you let her go I'm telling you that you're going to be forfeiting your right to have an attorney.
>
> DEFENDANT: That's fine.

> THE COURT: You understand if you do represent yourself
> that you are held to the same legal standards. I can't give
> you legal advice?
>
> DEFENDANT: Yes, sir, I understand

The trial court also stated Defendant would not have the right to another appointed attorney, and Defendant would have to hire his own attorney or represent himself. Defendant stated he understood.

At each colloquy, the trial court advised and counseled Defendant about his right to an attorney, including his right to appointed counsel. The trial court counseled Defendant on the complexity of handling his own jury trial and the fact the judge would neither be able to offer legal advice nor excuse non-compliance with any rules of evidence or procedure.

The trial court addressed the seriousness of the first-degree murder charge. The trial court advised a conviction by the jury of first-degree murder carried a life sentence without the possibility of parole. The trial court further told Defendant that no other appointed counsel would be able or willing to immediately step into the middle of an ongoing trial. After being fully advised, Defendant proceeded to fire McCallum and was left to acquire his own counsel or proceed *pro se*.

Defendant clearly waived and/or forfeited his right to further court-appointed counsel. Defendant's argument is overruled.

### D. Forfeiture of Counsel

Presuming, without deciding, Defendant did not give a knowing and voluntary

waiver of his right to counsel, we will also examine the trial court's and MAR court's holdings Defendant had forfeited his right to counsel.

Defendant asserts the trial court and MAR court judge erred in concluding he had forfeited his right to appointed counsel by his conduct.

Our Supreme Court has long held "the right to be defended by chosen counsel is not absolute." *McFadden*, 292 N.C. at 612, 234 S.E.2d at 745 (citation omitted). "[A]n indigent defendant does not have the right to have counsel *of his choice* to represent him." *State v. Anderson*, 350 N.C. 152, 167, 513 S.E.2d 296, 305 (1999) (citing *State v. Thacker*, 301 N.C. 348, 351-52, 271 S.E.2d 252, 255 (1980)).

"Forfeiture of counsel is separate from waiver because waiver requires a knowing and intentional relinquishment of a known right[,] whereas forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right." *State v. Schumann*, 257 N.C. App. 866, 879, 810 S.E.2d 379, 388 (2018) (citation and quotation marks omitted).

Our Court has held when a defendant has forfeited their right to counsel, then a "trial court is not required to determine, pursuant to [N.C. Gen. Stat.] § 1242 that [the] defendant knowingly, understandingly, and voluntarily waived such right before requiring him to proceed *pro se*." *State v. Leyshon*, 211 N.C. App. 511, 518, 710 S.E.2d 282, 288 (2011) (citation omitted).

In *Montgomery*, this Court examined the issue of a criminal defendant

forfeiting their right to counsel as an issue of first impression. *Montgomery*, 138 N.C. App. at 524, 530 S.E.2d at 69 ("Although the loss of counsel due to defendant's own actions is often referred to as a waiver of the right to counsel, a better term to describe this situation is forfeiture."). This Court held, *inter alia,* "a defendant who is abusive toward his attorney may forfeit his right to counsel." *Id.* at 525, 530 S.E.2d at 69 (citing *U.S. v. McLeod*, 53 F.3d 322, 325 (11th Cir. 1995)).

This Court further held "[a] forfeiture results when the state's interest in maintaining an orderly trial schedule and the defendant's negligence, indifference, or possibly purposeful delaying tactic, combine[ ] to justify a forfeiture of defendant's right to counsel[.]" *Id.* at 524, 530 S.E.2d at 69 (citing LaFave, Israel, & King *Criminal Procedure*, § 11.3(c) at 548 (1999) (quotation marks omitted)). The defendant had been afforded "ample opportunity" to obtain counsel over a period of over a year; had twice fired appointed counsel and had retained a private attorney; had been disruptive in the courtroom, causing the trial to be delayed; had refused to cooperate with his counsel when his counsel was not allowed to withdraw; and, had physically assaulted his counsel. *Id.* at 525, 530 S.E.2d at 69. This Court ultimately held the defendant had forfeited his right to counsel and the trial court did not have to follow the waiver procedures outlined in N.C. Gen. Stat. § 15A-1242. *Id.*

Since the decision in *Montgomery,* this Court has upheld a forfeiture only in "situations involving egregious conduct by a defendant." *See Blakeney*, 245 N.C. App. at 460, 782 S.E.2d at 93. The Supreme Court of North Carolina first examined and

recognized a defendant's forfeiture of counsel in *State v. Simpkins*, 373 N.C. 530, 535, 838 S.E.2d 439, 445-46 (2020) ("We have never previously held that a criminal defendant in North Carolina can forfeit the right to counsel."). Our Supreme Court recognized a defendant's forfeiture, holding: "in situations evincing egregious misconduct by a defendant, a defendant may forfeit the right to counsel." *Id.* at 535, 838 S.E.2d at 446.

While the Supreme Court, in *Simpkins*, recognized the ability of a criminal defendant to forfeit by "egregious misconduct" the right to counsel, the Court held the defendant's conduct in that case had not arisen to a forfeiture. *Id.* at 539, 838 S.E.2d at 448. The defendant did not employ counsel before appearing at trial and put forth "frivolous legal arguments about jurisdiction throughout the proceedings." *Id.* at 540, 838 S.E.2d at 448. The defendant had different counsels representing him previously during the pre-trial proceedings. *Id.*

The trial court did not conduct a colloquy to determine if the defendant was waiving his right to counsel under N.C. Gen. Stat. § 15A-1242. Our Supreme Court held this was error to fail to determine if the defendant desired to waive his right to counsel using the proper procedure and further held, under the facts in *Simpkins*, this defendant did not forfeit his right to counsel at trial. *Id.* at 540, 838 S.E.2d at 449. The record did not lead our Supreme Court to "conclude that h[is] failure to retain counsel was an attempt to delay the proceedings, and certainly not an attempt so egregious as to justify forfeiture of the right to counsel." *Id.*

In 2022, the Supreme Court of North Carolina further examined the forfeiture of counsel in both *State v. Harvin*, 382 N.C. 566, 879 S.E.2d 147 (2022) and *State v. Atwell*, 383 N.C. 437, 881 S.E.2d 124 (2022).

In *Harvin*, our Supreme Court analyzed over two decades of persuasive Court of Appeals precedent and found two circumstances where forfeiture of counsel could occur:

> The first category includes a criminal defendant's display of aggressive, profane, or threatening behavior. *See, e.g., id.* at 536-39 (first citing *State v. Montgomery*, 138 N.C. App. 521, 530 S.E.2d 66 (2000) (finding forfeiture where a defendant, *inter alia*, disrupted court proceedings with profanity and assaulted his attorney in court); then citing *State v. Brown*, 239 N.C. App. 510, 519, 768 S.E.2d 896 (2015) (finding forfeiture where a defendant "refus[ed] to answer whether he wanted assistance of counsel at three separate pretrial hearings [and] repeatedly and vigorously objected to the trial court's authority to proceed"); then citing *State v. Joiner*, 237 N.C. App. 513, 767 S.E.2d 557 (2014) (finding forfeiture where a defendant, *inter alia*, yelled obscenities in court, threatened the trial judge and a law enforcement officer, and otherwise behaved in a belligerent fashion); then citing *United States v. Leggett*, 162 F.3d 237 (3d Cir. 1998) (finding forfeiture where a defendant physically attacked and tried to seriously injure his counsel); and then citing *Gilchrist v. O'Keefe*, 260 F.3d 87 (2d Cir. 2001) (same)). . . .
>
> The second broad type of behavior which can result in a criminal defendant's forfeiture of the constitutional right to counsel is an accused's display of conduct which constitutes a "[s]erious obstruction of the proceedings." *Simpkins*, 373 N.C. at 538. Examples of obstreperous actions which may justify a trial court's determination that a criminal defendant has forfeited the constitutional right to counsel include the alleged

offender's refusal to permit a trial court to comply with the mandatory waiver colloquy set forth in N.C.G.S. § 15A-1242, "refus[al] to obtain counsel after multiple opportunities to do so, refus[al] to say whether he or she wishes to proceed with counsel, refus[al] to participate in the proceedings, or [the] continual hir[ing] and fir[ing of] counsel and significantly delay[ing] the proceedings." *Id.* at 538. In *Simpkins*, we further cited the decisions of the Court of Appeals in *Montgomery* and *Brown, inter alia*, as additional illustrations of this second mode of misconduct which can result in the forfeiture of counsel.

*Id.* at 587, 879 S.E.2d at 161.

In *Harvin*, the defendant had five court-appointed attorneys prior to trial. *Id.* at 590, 879 S.E.2d at 163. Two of the defendant's attorneys withdrew due to no fault of the defendant, and two others withdrew as a result of "respective incompatible attorney-client relationships with [the] defendant [and] did so *not* because of [the] defendant's willful tactics of obstruction and delay" but "due to differences related to the *preparation* of [the] [d]efendants defense" not a "refus[al] to *participate* in preparing a defense." *Id.* (citation omitted).

The defendant in *Harvin* indicated his intent to not represent himself at trial at a hearing approximately a month before trial. *Id.* at 574, 879 S.E.2d at 154. At a pre-trial hearing three weeks prior to trial, the defendant's stand-by-counsel stated he was prepared to serve as standby counsel, but was not prepared to assume full representation of the defendant. *Id.* On the morning of trial, the defendant also indicated his intent to not represent himself during a colloquy with the court to

comply with N.C. Gen. Stat. § 15A-1242. *Id.* at 575, 879 S.E.2d at 154. The trial court took a recess and attempted to locate any of the prior counsel who could come in, but none could. *Id.* at 579, 879 S.E.2d at 156.

The Supreme Court of North Carolina held the trial court erred by finding the defendant had forfeited his right to counsel and requiring the defendant to proceed *pro se*. *Id.* at 592, 879 S.E.2d at 164. The Supreme Court further held the defendant's behavior in requesting two of his counsel to be removed, seeking to proceed *pro se*, and then deciding he needed the help of counsel before proceeding at trial while remaining polite, cooperative, and constructively engaged in the proceedings was not "the type or level of obstructive and dilatory behavior which [would] allow[ ] the trial court . . . to permissibly conclude that [the] defendant had forfeited the right to counsel." *Id.*

The Supreme Court further examined forfeiture of counsel and applied reasonings from both *Simpkins* and *Harwin* in *Atwell*. During a pretrial hearing, the State had requested for the case to move forward after previously agreeing to a continuance to give more time for the defendant to hire a private attorney. *Atwell*, 383 N.C. at 448-54, 881 S.E.2d at 132-35. The defendant, appearing *pro se*, told the trial court "she had made payments to a private attorney", but could not afford to continue to make payments and wanted another court-appointed attorney. *Id.* at 440, 881 S.E.2d at 127. The trial court then responded with a history of her firing two prior attorneys, signing four waivers of appointed counsel, and asking why she now

wanted another continuance to hire yet another attorney.  *Id.*

Once the State indicated it was prepared to calendar the case for trial, the trial court addressed the defendant:

> THE COURT: Well, *what I'm going to do is I'm going to put an order in the file basically saying you waived your right to have an attorney.*  If you would like to hire your own attorney, that will be fine, but based on these — *the history of this file, it appears to me that your process in moving this case along has been nothing more than to see how long you can delay it until it goes away.*  The way you've behaved appears to be nothing more than a delay tactic and that's what I'm going to put an order in the file and I'm going to make specific findings as to everything I just told you and to some other things that are in the file.  I'm going to let the prosecutor arraign you and set this case for trial.  Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Now, that doesn't preclude you from hiring your own attorney.  *You can hire your own attorney but you're going to have to do that and have your attorney ready by the time the prosecutor has this case on the trial calendar.  Additionally, if you don't hire an attorney, you're going to be responsible for representing yourself.  Do you know what that means?*
>
> THE DEFENDANT: Representing myself.
>
> THE COURT: Yes.
>
> THE DEFENDANT: It means representing myself.
>
> THE COURT: It does.  It means you're going to have to negotiate any plea deal if there is one with the prosecutor.  You're going to have to handle all the [d]iscovery in this case.  If there is a jury trial you're going to have to select a jury and keep up with any motions and try the case just as if you were an attorney and be held to the same standard

as an attorney. You're not going to get legal advice from me or whoever the judge is. Do you understand that?

. . .

THE COURT: I don't know what's ultimately going to have [to] happen to this case but you are entitled to a jury trial most definitely. *What I want you to understand is that if you represent yourself, you're going to be held to the same standards of an attorney. Do you understand that?*

THE DEFENDANT: *You're giving me no choice. I mean, I asked for another court appointed attorney and you said no, so—*

THE COURT: You've had choice after choice after choice. *You've been given a court appointed attorney on three occasions, which is two more than you usually get.*

THE DEFENDANT: I've got the e-mails from one of the lawyers that was actually giving me wrong court dates to be in court.

THE COURT: Well, one of the attorneys there is no indication as to why that attorney withdrew, the other took—you took them off the case, basically. So do you understand what's going on here, ma'am?

THE DEFENDANT: *You've denied me a court appointed attorney. Yes, I understand that.*

THE COURT: I've denied you a fourth court appointed attorney.

THE DEFENDANT: I understand that, yes.

*Id.* at 440-43, 881 S.E.2d at 128 (footnote omitted).

The trial court, in *Atwell*, did not conduct an N.C. Gen. Stat. § 15A-1242 colloquy and entered an order stating the defendant had forfeited her right to counsel

through her delay tactics prior to trial. *Id.* at 454, 881 S.E.2d at 135. The Supreme Court held this was error.

Relying on the analysis of *Harvin*, the Supreme Court of North Carolina held "the record likewise does not permit an inference, much less a legal conclusion, by the trial court or a reviewing court that defendant engage[d] in the type of egregious misconduct that would permit the trial court to deprive defendant of [her] constitutional right to counsel." *Id.* at 453, 881 S.E.2d at 135 (internal quotation marks omitted). The defendant had not forfeited her right because she had "ongoing, nonfrivolous concerns about her case." *Id.* at 454, 881 S.E.2d at 135. The defendant could not waive her right to counsel without expressing "*the express*[ ] *desire to proceed without counsel*" through the statutory colloquy of N.C. Gen. Stat. § 15A-1242. *Id.*

A defendant may also forfeit their right to counsel by engaging in "serious misconduct." *Blakeney*, 245 N.C. App. at 460, 782 S.E.2d at 93. This Court has recognized forfeiture by misconduct when a defendant (1) engages in "flagrant or extended delaying tactics, such as repeatedly firing a series of attorneys;" (2) employs "offensive or abusive behavior, such as threatening counsel, cursing, spitting, or disrupting proceedings in court;" or (3) "refus[es] to acknowledge the trial court's jurisdiction or participate in the judicial process, or insist[s] on nonsensical and nonexistant legal 'rights.'" *Id.* at 461-62, 782 S.E.2d at 94.

The State asserts these facts present a "hybrid" situation from *Blakeney*.

While this may be true, Defendant both gave knowing and voluntary waivers of counsel, and he forfeited his right to counsel under our precedents. Defendant met all of the instances of "serious misconduct" to forfeit counsel. *See id.*

Including Krystal Moore, his sister, and her North Carolina sponsor, Defendant had seven attorneys representing him during the various stages of hearings and trial. Thomasine Moore and Paramore withdrew due to conflicts of interests. Moore's *pro hac vice* admission was revoked due to her conduct, noncompliance with our State's rules of *pro hac vice* admission, lack of participation or appearance by or responses from her North Carolina sponsor, and her lack of experience handling first-degree murder cases that could potentially result in an ineffective assistance of counsel claim. The trial court also found and concluded Moore was not "credible and [she] did not demonstrate candor with the Court."

While acknowledging that one counsel cannot command a co-counsel to withdraw, Castle petitioned to withdraw due to conflict between himself and Krystal Moore. Moore had requested for him to withdraw and had prevented contact between himself and Defendant. Defendant terminated appointed counsel Jack because of "different views."

At Defendant's express request, McCallum was appointed as trial counsel after she was initially appointed as his standby counsel. Defendant also later confirmed during trial he was satisfied with McCallum's representation. In the middle of trial following the testimony of Sharek, whose testimony the court found was highly

inculpatory, Defendant sought to terminate McCallum's representation and warned of her safety if she did not withdraw.

Unlike *Simpkins*, *Harvin*, and *Atwell,* wherein our Supreme Court held there was no egregious misconduct, none of those cases involve a defendant's decision to fire a counsel during the middle of trial after the jury was empaneled and the State had presented its case in chief. This incident was not Defendant's only misconduct.

McCallum informed the trial court she should be allowed to withdraw because she had been informed by Defendant she should withdraw for her safety. This threat was documented in the trial court's denial of Defendant's MAR as constituting "offensive or abusive behavior." *Id.*

The trial court also documented misconduct by Krystal Moore and Defendant of preparing and sharing purported complaints to the North Carolina State Bar against both district attorneys and McCallum during trial. Defendant purportedly "signed" the complaint against McCallum electronically, despite not having access to a computer and testifying in open court on 9 February 2022 that he was satisfied with McCallum's services. The trial court attributed the change from 9 February 2022 to 14 February 2022 to the testimony of Sharek. The purported "conflicts" with the attorneys, which were attributable to Defendant and/or Krystal Moore, were found and concluded to be "attempts to disrupt the orderly administration of justice."

The trial court specifically found and concluded Defendant's decision to fire McCallum "was an attempted effort to delay, disrupt and obstruct the proceedings

and prevent them from coming to completion which undermines the purposes of the right to counsel and constitutes 'egregious misconduct.'"

After Defendant was allowed to terminate McCallum's representation, but learned the trial underway was going to proceed, Defendant informed the Court he did not want to be physically present in the courtroom. Defendant's egregious conduct forfeited his right to further appointed counsel. The trial court did not err in concluding Defendant had forfeited his right to appointed counsel and by later denying his MAR on this ground.

Defendant's MAR asserted he was denied the counsel of his choice in violation of his rights under the Sixth Amendment to the United States Constitution when the trial court revoked Krystal Moore's *pro hac vice* admission *ex mero motu*. *See* N.C. Gen. Stat. § 84-4.2 (2021) ("Permission granted under G.S. 84-4.1 may be summarily revoked by the General Court of Justice . . . on its own motion and in its discretion."). The order denying the MAR properly denied relief based upon the lack of sponsoring counsel's appearance in Onslow County; Krystal Moore's conduct, lack of attendance in court, lack of candor with the court, errors in North Carolina law and procedure, and lack of criminal trial experience; the role of appointed counsel; and Defendant's right to competent counsel. Defendant did not advance this argument on appeal and has abandoned this argument. *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."). Defendant's argument is without merit and is dismissed.

### E. Motion for Appointment of Counsel

Defendant argues the trial court erred by denying his 17 February 2022 motion for a court-appointed attorney. This argument is deemed abandoned for his failure to cite any authority in support thereof. N.C. R. App. P. 28(b)(5). As held above, Defendant had already waived and forfeited his right to an attorney three days earlier during trial outside of the presence of the jury.

### V. Motion for Continuance

Defendant argues the trial court erred in denying his motion to continue the trial during trial to enable him to secure other counsel, after allowing his trial counsel to withdraw at his request, after the jury was empaneled, and while the State was presenting its case in chief.

### A. Standard of Review

A motion to continue generally rests within the trial court's discretion and is reviewable on appeal only for an abuse of discretion. *State v. Thomas*, 294 N.C. 105, 111, 240 S.E.2d 426, 431 (1978) (citations omitted). When the motion to continue is based on a constitutional right, "the question presented is one of law and not of discretion, and the order of the court below is reviewable" on appeal. *State v. Harris*, 290 N.C. 681, 686, 228 S.E.2d 437, 440 (1976) (citations omitted).

### B. Analysis

"To establish a constitutional violation, a defendant must show that he did not have ample time to confer with counsel and to investigate, prepare and present his

defense." *State v. Tunstall,* 334 N.C. 320, 329, 432 S.E.2d 331, 337 (1993) (citation omitted).

Defendant sought to continue his trial in progress to enable him to fire his appointed attorney, who had entered appearance, filed motions, represented him for jury selection, opening statement, and during the State's case-in-chief. Defendant was informed no other appointed counsel would be able to effectively represent him by immediately appearing in the middle of a first-degree murder trial. As held above, Defendant had already waived and forfeited his right to an attorney three days earlier during trial. The trial court did not err in denying Defendant's motion to continue.

## VI. Sharek's Testimony

Defendant contends the trial court erred in admitting testimony from Sharek under Rules 401, 402, 403, and 404(b).

### A. Preservation

Our appellate rules provide: "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). Our Supreme Court has held:

> To preserve an issue for appeal, the defendant must make an objection at the point during the trial when the State attempts to introduce the evidence. A defendant cannot rely on his pretrial motion to suppress to preserve an issue for appeal. His objection must be renewed at trial. [The

defendant's] failure to object at trial waived his right to have this issue reviewed on appeal.

*State v. Golphin*, 352 N.C. 364, 463, 533 S.E.2d 168, 232 (2000) (internal citations omitted).

"To be timely, an objection to the admission of evidence must be made at the time it is actually introduced at trial." *State v. Ray*, 364 N.C. 272, 277, 697 S.E.2d 319, 322 (2010) (citation and quotation marks omitted).

It is insufficient to rely upon the objections lodged pre-trial or after similar evidence has previously been admitted without protest as "the admission of evidence without objection waives prior or subsequent objection to the admission of evidence of a similar character." *State v. Hudson*, 331 N.C. 122, 151, 415 S.E.2d 732, 747-48 (1992) (citation and quotation marks omitted).

Defendant's counsel, McCallum, filed a motion *in limine* to exclude the testimony of Sharek "pursuant to North Carolina General Statute § 58C-1 Rules 401, 402, 403, & 404(b); and Rules 701-02; and North Carolina General Statute § 15A-951-952[.]"

The trial court held a hearing on Defendant's motion on 1 October 2021. McCallum argued:

> Again, this is limited. We're just asking that the term "rapist" or "barber" -- "rapist barber," those two terms not be allowed into testimony or the State be able to present anything, type of compilation that showed that's what was stated in her phone. We understand her testimony is going to be her testimony, but to allow a term such as "rapist" or

> "rapist barber" or to show that's how she stated it is highly prejudicial, improper character evidence on top of that. It will just inflame the jury. So at this point, you know, if her testimony is sufficient (phonetic), we just ask that those terms not be used by her any other -- anyone else, that he's been labeled as a rapist or that she had saved in her phone that he was a rapist or a rapist barber is the term that was used.

McCallum continued:

> Right. We understand she's going to testify. We're just asking that "rapist" or "rapist barber" should not be a part of any testimony, whether officer or her or anything shown in any exhibits where her phone had it saved as that, or her alluding to saying that. That's what we're asking for. We definitely feel the probative value substantially outweighs the danger of unfair prejudicial.

The trial court redacted the term "rapist" from Sharek's cellular phone information. McCallum never argued the entirety of Sharek's testimony of her encounter with Defendant should be excluded during the motion *in limine.*

When Officer Michael Gibbs, the officer who had downloaded cellular data, including a photo purportedly of Defendant from Sharek's cell phone, was on the stand and the line of questioning was leading toward this information from Sharek and Defendant's image on her cell phone, McCallum renewed her objection for the same grounds as her motion *in limine.* The trial court heard arguments from McCallum outside of the presence of the jury:

> Yes, Your Honor, just to reiterate what was argued concerning excluding testimony from Denell Sharek. Because I know that is where this is going since Officer Gibbs is the one that downloaded the cell phone to the

Cellebrite and obtained the photo of [Defendant] based on her allegations of rape. So I know we are starting to get out into it. I'm renewing the objection on the record. I'm confident. I'm sure once the jury comes back in and once she is called as a witness I'm going to have to renew it again. The objection is concerning the testimony and the photo that is trying to be published to the jury and entered into evidence pursuant to 8C-1 Rules 401, 402, 404B and Rule 701 and 702, and that is pursuant to the North Carolina General Statute 15[A]-1951 and 1952. If I need to file another copy of what was filed. We, again, argue that is going to be very prejudicial to allow her to get up and there are no charges that have been filed against him. This is something that was brought to attention when she was under investigation -- I don't want to say she was under investigation, but she was being questioned about being one of the last persons to speak to Ms. Brown. Then it turns into a situation where a photo was provided to her and, Your Honor, it definitely there would be some information provided where she will say, as she has said in her statements, that it happens. Where someone will take a photo -- someone took her photo and used it and pretend like there [sic] someone else; and this goes to identification. There was no identification done prior to today, and so that is a part of what is going to happen today. *I will also have to renew the objection when that happens also if the Court allows her to testify and this photo to be brought into evidence.* There was no out-of-court identification of [Defendant] except for the photo that was presented from her phone.

(emphasis supplied). The trial court subsequently overruled Defendant's objection and allowed Officer Gibbs to testify about the photograph, which had been sent from one of Defendant's phones to Sharek.

When Sharek was called to the stand, McCallum objected on the grounds of: "8C-1 Rules 401, 402, 403, and 404B in the due process of my client." Defendant did

not object during Sharek's testimony. Defendant asserts this objection preserves his arguments asserting Sharek's testimony violated Rules 401, 402, 403, and 404(b) on appeal, citing N.C. Gen. Stat. § 1446(d)(10) (2021) and *State v. Corbett*, 376 N.C. 799, 826, 855 S.E.2d 228, 248 (2021).

"In N.C. [Gen. Stat.] § 15A-1446(d) (2017), the General Assembly enumerated a list of issues . . . appealable without preservation in the trial court." *State v. Meadows*, 371 N.C. 742, 747-48, 821 S.E.2d 402, 406 (2018). Our Supreme Court reviewed N.C. Gen. Stat. § 1446(d)(10) and held "notwithstanding a party's failure to object to the admission of evidence at some point at trial, a party may challenge subsequent admission of evidence involving a specified line of questioning when there has been an improperly overruled objection to the admission of evidence involving that line of questioning." *Corbett*, 376 N.C. at 826, 855 S.E.2d at 248 (citation, quotation marks, and alteration omitted).

In *Corbett*, the defendants objected to testimony based upon purported blood splatters found on their clothing on numerous occasions. The defendants objected to a portion of the blood splatter expert's report, but failed to object again when he testified at trial. Our Supreme Court held *inter alia*, N.C. Gen. Stat. § 1446(d)(10) preserved their objections by operation of law.

McCallum's only objection to Sharek's testimony at trial was the general objection on the grounds of: "8C-1 Rules 401, 402, 403, and 404B in the due process of my client" prior to her testimony. The trial court had previously redacted text

references to Defendant as "rapist" and other prejudicial text references after her pre-trial motion.

This objection, presuming it was directed toward Sharek's entire involvement with Defendant and no charges currently pending related to that incident, was untimely and did not specifically preserve the admission for appellate review. *See State v. Williams*, 355 N.C. 501, 576, 565 S.E.2d 609, 652 (2002) (citations omitted). This assertion was not an "improperly overruled objection" to trigger N.C. Gen. Stat. § 15A-1446(d)(10).

Defendant argues in the event he did not preserve his evidentiary arguments, he seeks plain error review of these issues. We review these arguments under that standard. *See* N.C. R. App. P. 10(a)(4) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved . . . nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.").

## B. Standard of Review

Our Supreme Court has held plain error:

> is always to be applied cautiously and only in the exceptional case where, after the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where the error is grave error which amounts to a denial of a fundamental right to the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity

or public reputation of judicial proceedings[.]

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citations and internal quotation marks omitted).

### C. Analysis

### *1. Rules 401 & 402*

Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2021). Irrelevant evidence is evidence "having no tendency to prove a fact at issue in the case." *State v. Hart*, 105 N.C. App. 542, 548, 414 S.E.2d 364, 368, (1992). Evidence is admissible so long as it is relevant, unless excluded under another Rule. N.C. Gen. Stat. § 8C-1, Rule 402 (2021). Defendant argues the rape and other allegations of the encounter between Defendant and Sharek is not relevant to whether he killed Brown. Defendant only argued it was inadmissible on appeal under Rule 401.

Defendant's argument is misplaced. The challenged testimony was relevant under Rule 401 and admissible under Rule 402. The evidence was admissible, relevant, and probative to show the identity of the person who is alleged to have committed the crimes. Defendant has failed to show Sharek's testimony was irrelevant and inadmissible under Rules 401 and 402. N.C. Gen. Stat. § 8C-1, Rules 401, 402.

## 2. *Rule 404(b)*

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2021).

The Supreme Court of North Carolina has repeatedly interpreted Rule 404(b) to be a rule of inclusion, and not exclusion. *State v. Beckelheimer*, 366 N.C. 127, 131, 726 S.E.2d 156, 159 (2012). This rule of inclusion of Rule 404(b) testimony or evidence is constrained by the requirements of similarity and temporal proximity of the evidence of the acts. *State v. Al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002). Rule 404(b) is "subject to but *one exception* requiring the exclusion of evidence if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Lyons*, 340 N.C. 646, 668, 459 S.E.2d 770, 782 (1995) (citation omitted).

Defendant argues the alleged rape and robbery of Sharek is too dissimilar from the murder of Brown to be admitted under Rule 404(b). The trial court allowed Sharek to testify about the circumstances leading up to an alleged rape of her and the subsequent events, which occurred 5 December 2017, the day after Brown was last seen or heard from alive. The trial court admitted this testimony for the purpose

of showing the "identity of the person who committed the crime charged in this case."

"When the features of the earlier act are dissimilar from those of the offense with which the defendant is currently charged, such evidence lacks probative value." *State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989), *sentence vacated on other grounds*, 494 U.S. 1023 ,108 L.Ed.2d 114 (1999). "[T]he passage of time between the commission of the two acts slowly erodes the commonality between them[.]" *State v. Jones*, 322 N.C. 585, 590, 369 S.E.2d 822, 824 (1988).

"Further, where the perpetrator's identity is in question, there must be significant similarities and little passage of time between incidents." *State v. Enoch*, 261 N.C. App. 474, 490, 820 S.E.2d 543, 555 (2018) (citing *State v. Scott*, 318 N.C. 237, 247, 347 S.E.2d 414, 420 (1986) (alterations and quotation marks omitted)).

Substantial evidence of similarity between the Defendant's prior bad acts with Sharek and of Brown's murder exists. Sharek alleged she was raped and robbed by Defendant the day after Brown's last known contact. Defendant used the same phone number to locate, message, and solicit both prostitutes: Brown and Sharek. The location Sharek identified where her assault and robbery had occurred was the location where Brown's stabbed and burned body was later discovered. Sharek was allegedly raped inside the Kia Sorrento SUV, which was later found to contain Brown's DNA. Brown texted her mother she had been raped and assaulted in the back seat of a vehicle by a man fitting Defendant's description. Sharek testified she was raped in the back seat of the Kia Sorrento. Defendant stole both Sharek's and

Brown's phones. The temporal proximity and place of both events and Sharek's testimony identifying Defendant far exceed any assertion that "its *only* probative value [was] to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *Lyons*, 340 N.C. at 668, 459 S.E.2d at 782. Defendant's argument is overruled. N.C. Gen. Stat. § 8C-1, Rule 404(b) (2021).

### 3. *Rule 403*

Even relevant, probative, and admissible evidence under Rules 401, 402, and 404(b) "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2021). Defendant argues the probative value of admitting this evidence is outweighed by the danger of unfair prejudice, and asserts the alleged prior actions with Sharek was admitted solely to establish his general propensity to commit the crime charged.

When prior incidents are offered for a proper purpose, the ultimate test of admissibility is whether they are sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in Rule 403." *State v. West*, 103 N.C. App. 1, 9, 404 S.E.2d 191, 197 (1991). "[E]very circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury." *State v. Whiteside*, 325 N.C. 389, 397, 383 S.E.2d 911, 915 (1989) (citation omitted).

The alleged incident where Sharek was raped and robbed by Defendant occurred the day after Brown's last contact with her family and the day the State alleged she was murdered. The alleged attack and robbery occurred in the same location where Brown's body was later found. Brown's text messages alleged she had been raped. The trial court did not err, and certainly did not commit plain error, in admitting Sharek's testimony under Rules 403 and 404(b). N.C. Gen. Stat. § 8C-1, Rules 403, 404(b). Defendant's argument is overruled.

## VII. Conclusion

Defendant knowingly and voluntarily waived his right to counsel by terminating his latest among many appointed counsels following highly detrimental testimony during trial and after being repeatedly advised and informed of the consequences of this decision. Defendant's conduct during pre-trial and through trial in superior court supports a finding and conclusion that he repeatedly dismissed appointed counsel during pre-trial and while trial was underway and waived and forfeited his right to counsel.

The trial court did not err in denying his motion for appointment of new counsel. Defendant waived and forfeited his right to counsel through dilatory tactics and serious and egregious misconduct after being warned multiple times of the consequences of his behavior.

Sharek's testimony was properly admitted under North Carolina Rules of Evidence 401, 402, 403, and 404(b) under plain error review. N.C. Gen. Stat. § 8C-1,

Rules 401, 402, 403 and 404(b).

Defendant received a fair trial, free of prejudicial errors he preserved and argued and failed to show any plain error.  There is no error in the jury's verdict or in the judgment entered thereon.  *It is so ordered.*

NO ERROR.

Judges CARPENTER and GORE concur.